

AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Information associated with account identified as )
Facebook user identification number 100008551869624, )
a social media account that is stored at premises )
controlled by Facebook, Inc. )

Case No. **17 MJ 00130**

## APPLICATION FOR A 18 U.S.C. § 2703 SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ **Northern** _____ District of _____ **California** _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

FILED
CLERK, U.S. D...
JAN 2 3 2017
CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

The search is related to a violation of:

*Code Section(s)*                          *Offense Description*
18 U.S.C. §§ 545 and 1956(a)(1)(A)(i); 21 U.S.C. §§ 841, 846,      See attached Affidavit
952, 960

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

_____
*Applicant's signature*
Justin Wiessner, Special Agent, Dept of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **January 23, 2017**

_____
*Judge's signature*

City and state: Los Angeles, California

Karen Stevenson, U.S. Magistrate Judge
*Printed name and title*

SF
SAUSA: Stacey Fernandez, x3152

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

This warrant applies to information associated with the account identified as:

a.   Facebook user identification number 100008551869624 ("SUBJECT ACCOUNT"), URL: www.facebook.com/100008551869624, User Name: Maxx Kuipers, that is within the possession, custody, or control of Facebook, Inc., a company that accepts service of legal process at 1601 Menlo Park, California 94025, regardless of where such information is stored, held, or maintained.

## ATTACHMENT B

## ITEMS TO BE SEIZED

### I. SEARCH PROCEDURE

1.    The search warrant will be presented to personnel of Facebook, Inc. ("FACEBOOK"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, FACEBOOK's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    FACEBOOK's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by FACEBOOK (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

5.  If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.  The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from FACEBOOK of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.  Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from FACEBOOK will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court. Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.  The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other csourt order.

9.  Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

iii

## II.   INFORMATION TO BE DISCLOSED BY FACEBOOK

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of FACEBOOK, including any information that has been deleted but is still available to FACEBOOK, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), FACEBOOK is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred between June 1, 2015, to June 6, 2016, including:

i.   All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures or photos, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii.   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, FACEBOOK

passwords, FACEBOOK security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

      iv.    All records pertaining to communications between FACEBOOK and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

      v.    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, as well as any metadata associated therewith;

      vi.    All profile information and Neoprint information, including the user's website; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' FACEBOOK user identification numbers; groups and networks of which the user is a member, including the groups' FACEBOOK group identification numbers; future and past event postings; "Friend" requests, including Friend requests sent to or from the SUBJECT ACCOUNT, and including Friend requests accepted or rejected; comments; gifts; pokes; tags, including both who has been tagged on the SUBJECT ACCOUNT's profile and when the user of the SUBJECT ACCOUNT has been tagged in other users' profiles; notifications and notification settings of any kind; and information about the user's access and use of FACEBOOK applications or "apps";

vii.     All other records of communications and messages of any kind made or received by the user, including all private or instant messages, and specifically including all attachments to any messages in their native formats (for example, if a .zip file was sent to another user, the .zip file shall be provided), history of communications of any kind, video calling history, and pending "Friend" requests;

viii.     All activity logs for the account and all other documents showing the user's posts and other FACEBOOK activities;

ix.     All records of FACEBOOK searches or Internet searches or webs searches performed by the account;

x.     All search history and web history by the user of the SUBJECT ACCOUNT, including web browsing that might occur outside of FACEBOOK, but that FACEBOOK is able to connect to the SUBJECT ACCOUNT when the SUBJECT ACCOUNT visits websites that are using FACEBOOK's webpage "like" functionality;

xi.     All records of the account's usage of the "Like" feature, including all FACEBOOK posts and all non-FACEBOOK webpages and content that the user has "liked," as well as all information about the FACEBOOK pages of which the account is or was a "fan" and any information in the account's connections;

xii.     All records of FACEBOOK Notes or use of FACEBOOK's web logging or "blogging" features, including importing of blogs from other services;

xiii.    All stored passwords, including passwords stored in clear text and hash form, and for any hashed values that include a salt, FACEBOOK shall provide the salt value used to compute the stored password hash value, and any security questions and answers;

xiv.    All search history and web history, including web clicks or "History Events," by the user of the SUBJECT ACCOUNT;

xv.    All web browsing activities that are identifiable with the SUBJECT ACCOUNT;

b.    All other records and information, including:

i.    All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), other account names or e-mail addresses associated with the account, telephone numbers, physical addresses, and other identifying information regarding the subscriber, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, and including any changes made to any subscriber information or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)   the SUBJECT ACCOUNT;

vii

(II) any other account associated with the cookie(s) associated with the SUBJECT ACCOUNT;

(III)       any other account associated with the SUBJECT ACCOUNT, including by means of sharing a common secondary, recovery, or alternate e-mail address listed in subscriber records for the SUBJECT ACCOUNT or by means of sharing a common phone number or SMS number listed in subscriber records for the SUBJECT ACCOUNT; and

(IV) any other account accessed by a device with an identifier responsive to the device identifiers called for in paragraph 10.b.xi.

ii.    All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations.

iii.    All "check ins" and other location information;

iv.    All past and present lists of friends created or accepted by the account;

v.    All privacy settings and other account settings, including privacy settings for individual FACEBOOK posts and activities, privacy settings that apply to certain lists of FACEBOOK friends and the accompanying lists, and all records showing which FACEBOOK users have been blocked by the account;

vi.     All information about the user's access and use of FACEBOOK Marketplace;

vii.    All information about connections between the account and third-party websites and applications;

viii.   All information related to the SUBJECT ACCOUNT's membership in any groups, including the identity of other accounts in the same group, and information identifying any groups or organizational pages or accounts for which the SUBJECT ACCOUNT is an administrator;

ix.     any and all logs of user activity and user agent string, including:  web requests or HTTP requests; any logs containing information such as the Requestor's IP address, identity and user ID, date and timestamp, request URI or URL, HTTP protocol version, referrer, and other user agent string information; login tracker logs; account management logs; and any other information concerning other e-mail or social media accounts accessed by or analytics related to the SUBJECT ACCOUNT;

x.      Any and all cookies used by any computer or web browser associated with the SUBJECT ACCOUNT, including the IP addresses, dates and times associated with the recognition of any such cookie;

xi.     Any information identifying the device or devices used to access any SUBJECT ACCOUNT, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifiers, Global Unique Identifier or "GUID," serial number, mobile

network information, phone number, device serial number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), International Mobile Equipment Identities ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA"), and any other information regarding the types of devices used to access each SUBJECT ACCOUNT or other device-specific information; and

      xii.    Any information showing the location of the user of a SUBJECT ACCOUNT, including while sending or receiving a message using a SUBJECT ACCOUNT or accessing or logged into a SUBJECT ACCOUNT.

## III. INFORMATION TO BE SEIZED BY THE GOVERNMENT

11.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

    a.    All information described above in Section II.10.a that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 545 (Smuggling Goods into the United States) and 1956(a)(1)(A)(i) (Money Laundering) and 21 U.S.C. §§ 841 (Distribution of a Controlled Substance), 846 (Attempt and Conspiracy), and 952 and 960 (Importation of a Controlled Substance) (collectively, the "Subject Offenses") namely:

i.    Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.    Records, documents, programs, applications, and materials relating to communications between LUCIFER and any person relating to the sale of illegal drugs;

iii.    Records, documents, programs, applications, and materials relating to Title 18 USC § 545 (Smuggling Goods into the United States);

iv.    Records, documents, programs, applications, and materials relating to Title 18 USC § 1956(a)(1)(A)(i) (Laundering of Monetary Instruments);

v.    Records, documents, programs, applications, and materials relating to Title 21 USC § 846 and 841(a)(1) (Conspiracy to Import a Controlled Substance);

vi.    Records, documents, programs, applications, and materials relating to Title 21 USC § 841(a)(1) (Distribution of a Controlled Substance);

vii.    Records, documents, programs, applications, and materials relating to Title 21 USC § 952 and 960: (Importation of a Controlled Substance);

b.    All records and information described above in Sections II.10.b.

IV.   PROVIDER PROCEDURES

12.   IT IS ORDERED that the FACEBOOK shall deliver the information set forth in Section II within 10 days of the

service of this warrant.   FACEBOOK shall send such information
to:

>       Justin Wiessner, Special Agent
>       Homeland Security Investigations
>       34 Civic Center Plaza, 4th Floor
>       Santa Ana, CA 92701
>       Office:  (714) 972-4175
>       FAX: (714) 972-4121
>       Email:  justin.wiessner@dhs.gov

13.   IT IS FURTHER ORDERED that FACEBOOK shall provide the
name and contact information for all employees who conduct the
search and produce the records responsive to this warrant.

14.   IT IS FURTHER ORDERED that FACEBOOK shall not notify
any person, including the subscriber(s) of each account
identified in Attachment A, of the existence of the warrant,
until further order of the Court or until written notice is
provided by the United States Attorney's Office that
nondisclosure is no longer required.

## AFFIDAVIT

I, Justin Wiessner, being duly sworn, declare and state as follows:

### I.    PURPOSE OF THE AFFIDAVIT

1.    I make this affidavit in support of an application for a search warrant for information associated with an account, identified as FACEBOOK user identification number 100008551869624 ("SUBJECT ACCOUNT"), URL: www.facebook.com/100008551869624, User Name: Maxx Kuipers, a social media account, described in Attachment A, that is within the possession, custody, or control of Facebook, Inc. ("FACEBOOK"), a social networking company and provider of electronic communication and remote computing services, headquartered in Menlo Park, California.   The FACEBOOK information to be searched is described in the following paragraphs and in Attachment A.   This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require FACEBOOK to disclose to the government records and other information (including the content of communications) described in Section II of Attachment B.   Attachments A and B are incorporated herein by reference.

2.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with a SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. §§ 545 (Smuggling Goods into the United States) and

1956(a)(1)(A)(i) (Money Laundering) and 21 U.S.C. §§ 841
(Distribution of a Controlled Substance), 846 (Attempt and
Conspiracy), and 952 and 960 (Importation of a Controlled
Substance).

     3.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.   This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter.   Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## II.  AGENT BACKGROUND

     4.   I am a Special Agent ("SA") with the Department of
Homeland Security, Homeland Security Investigations ("HSI"), and
I am an investigative or law enforcement officer of the United
States within the meaning of Section 2510(7) of Title 18, United
States Code. I am empowered to conduct investigations and to
make arrests for federal felony offenses.   As such, I am an
"investigative or law enforcement officer" of the United States
within the meaning of Section 2510(7) of Title 18, United States
Code; that is, an officer of the United States empowered by law
to conduct investigations of, and to make arrests for, offenses
enumerated in Section 2516 of Title 18, United States Code.

     5.   I have received training and have experience
investigating violations of federal narcotics and money

laundering laws, including but not limited to, Title 21, United States Code, Sections 841, 846, 952, 959, 960, and 963 and Title 18, United States Code, Section 1956(a). I have been involved in various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the manufacturing, distribution, transportation, storage, and importation of controlled substances and the laundering of drug proceeds.

6. I have been employed with HSI since November 2008. As part of my training with HSI, I attended training at the Federal Law Enforcement Training Center in Georgia. I have received specialized training pertaining to narcotics trafficking, money laundering, and electronic and physical surveillance procedures as well as the preparation and execution of search and arrest warrants. Prior to that, I was a United States Customs Inspector and a police officer. I have over 13 years of law enforcement experience.

7. I am currently assigned to the HSI office in Orange County ("OR"), California, Public Safety Group, which is an enforcement group that investigates violations of federal controlled substances laws and the criminal activities of transnational gang, among other things. During my time with HSI, I have either been the supporting or lead agent in criminal investigations dealing with the possession, manufacture, distribution, and importation of controlled substances and the laundering of narcotics proceeds. These investigations also involved surveillance, conducting the installation of court

3

ordered tracking devices, executing search warrants, wiretaps, seizing narcotics-related assets, and making arrests for state offenses.

## II.   SUMMARY OF INVESTIGATION

8.   HSI is participating in a large-scale investigation, in conjunction with Dutch authorities, of a controlled substances trafficker in the Netherlands known as Lucifer ("LUCIFER"), who has previously shipped controlled substances to locations within Orange County, California, and elsewhere.  As set forth below LUCIFER used the SUBJECT ACCOUNT to market and distribute 3,4-methylenedioxy-methamphetamine ("MDMA" or "Ecstasy") and cocaine.

9.   As part of its investigation, HSI identified an individual ("Cooperating Source" or "CS"), who was LUCIFER's primary customer in Orange County.  The CS, who has no prior criminal history, was arrested after a controlled delivery and agreed to cooperate with HSI.

10.   Working with HSI, CS used FACEBOOK to communicate with LUCIFER, using the SUBJECT ACCOUNT.  In these communications, which took place from June 17, 2015, to June 2, 2016, CS and LUCIFER discussed, in detail, transactions for the purchase of MDMA and other drugs, means of payment, and money CS owed to LUCIFER.

11.   On June 8, 2016, HIS sent a preservation request to FACEBOOK.  The preservation request expires today, January 23, 2017.

12.   I believe there is probable cause to conclude that the
SUBJECT ACCOUNT contains information related to the trafficking
of drugs (cocaine and ecstasy) to the United States from the
Netherlands.   Based on the information supplied by the CS,
including the screen captures of FACEBOOK communications between
CS and LUCIFER, using the SUBJECT ACCOUNT, I believe that
LUCIFER uses the SUBJECT ACCOUNT for the purpose of discussing
and arranging narcotics transactions.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

13.   Based on personal knowledge and involvement in the
investigation, and discussions with other investigators, I know
the following facts.

### A.   Investigation Identifies the CS

14.   On or about June 2, 2015, the United States Customs
and Border Protection ("CBP") Mail Facility in San Francisco,
California, contacted HSI-OR with a package (PACKAGE #1)
containing 425 grams of pills that field tested positive for
MDMA.   This package was destined for SOURCE #1 and the return
address on the package was listed as MAX KUIPERS, Jan
Vermeerstraat 43, 7204 CL Zutphen, the Netheralands."

15.   On or about June 4, 2015, the CBP Mail Facility in San
Francisco contacted HSI-OR with another package (PACKAGE #2)
containing approximately 250 grams of pills which field tested
positive for MDMA.   This package was destined for SOURCE #2 and
the return address on the package was listed as MAX KUIPERS, Jan
Vermeerstraat 43, 7204 CL Zutphen, "the Netheralands."

16.    On June 5, 2015 SA Mandoli and SA Sugyiama interviewed SOURCE #1 and spoke to SOURCE #1.  During the interview, SOURCE #1 stated that he/she was the person listed on the package.  However, the package was ultimately destined for the CS.  SOURCE #1 agreed to cooperate.  SOURCE #1 admitted the he/she knew that the MDMA pills from the Netherlands were being shipped to him/her at his/her residence.  S/he stated that s/he knew MDMA was an illegal substance and that he/she was breaking United States law.  SOURCE #1 explained that his/her involvement in the scheme was limited as he/she was merely the recipient of the package.  The MDMA pills contained in the package would be distributed by another person.  SOUCE #1 explained that he/she was to receive $2,000 for his/her participation.

17.    SOURCE #1 also said that the ultimate recipient was a person who lived in Stanton, California, who SA Sugiyama identified as the CS through the use of Law Enforcement Databases.

18.    On June 9, 2015, HSI SA Sugiyama and SA Mandoli conducted a consensual interview with SOURCE #2.  During the interview, SOURCE #2 admitted that he/she knew that MDMA pills from the Netherlands were being shipped to his/her residence.  He/she stated that s/he knew MDMA was an illegal substance and that he/she was breaking United States law.  SOURCE #2 explained that his/her involvement in the scheme was limited as s/he was merely the recipient of the package.

19.    SOURCE #2 also said that the ultimate recipient was his/her friend, CS, who lived in Stanton, California.  SOURCE #2

explained that he/she met CS through mutual friends and had

known the CS for over a year.   SOURCE #2 said that he/she had

received packages containing MDMA twice before on behalf of CS.

20.   On June 10, 2015, the HSI-OR Public Safety Group and

the Placentia Police Department ("PPD") arrested the CS

following to a controlled delivery containing 249.9 grams of

MDMA imported to the United States from the Netherlands.   After

the CS' arrest, the CS agreed to cooperate with the

investigation.[1]

### B.   CS Communications with Lucifer Using the SUBJECT ACCOUNT

21.   At a June 17, 2015, interview, the CS gave HSI

information regarding the partial identity of CS' Source of

Supply ("SOS").   CS stated, that since January 2015, his SOS was

an individual known only by the aliases MAX KUIPERS, MAXX

KUIPERS, and LUCIFER ("LUCIFER"), who lives in the Netherlands.

According to CS, LUCIFER has shipped approximately 15 packages

of MDMA, brokered by CS, to Orange County.   CS stated he owed

LUCIFER approximately $7,000 for the MDMA pills contained in the

four packages seized by HSI.[2]   According to information provided

by CS and evidence seized from CS, the CS used various forms of

communication to market and distribute MDMA and cocaine,

---

[1] CS has no criminal history.   CS has not been promised any specific benefit, but is cooperating in the hope of consideration at sentencing.

[2] At HSI's direction, the CS later paid LUCIFER the money in order to maintain the relationship while the investigation was underway.

including social·media such as Twitter, FACEBOOK, Tumblr, as well as messenger services such as Kik and Wicker.

22. On June 19, 2015 SA Bonesz, SA Mandoli, SA Wiessner and SA Sugiyama met with the CS in Orange, California. During this meeting, CS explained how LUCIFER used photo sharing sites such as Tumblr to post pictures of his drugs but sent messages to the CS via FACEBOOK. In addition, CS also brought and turned over to HSI agents an unopened parcel from LUCIFER, with a return address of "Max Kuipers Jan Vermeerstraat 43, 7204 CL Zutphen, the Netherlands." The parcel had not been detected by CBP and had been delivered to Compton, California. This parcel was destined for the CS and contained approximately 680 grams (approximately 1,000 pills) of suspected MDMA.

23. Between June 17, 2015, and June 23, 2015, at HSI's direction, CS began communicating through FACEBOOK, with LUCIFER, who was utilizing the SUBJECT ACCOUNT. Replying to a message LUCIFER sent the CS on June 13, 2015, during this time period, the CS explained to LUCIFER why the CS had not yet paid LUCIFER and was seemingly absent from contact. These conversations were not directly monitored by HSI but SA Bonesz was in contact with CS and gave CS direction to tell LUCIFER that everything was okay and that LUCIFER would get his money soon.

24. On June 29, 2015, SA Bonesz and SA Sugiyama met with CS at the HSI-OR Office in Santa Ana, California. In the presence of SA Bonesz and SA Sugiyma, CS handed over printed copies of conversations between CS and LUCIFER, using the

SUBJECT ACCOUNT.   In conversations from June 13, 2015, to June 27, 2015, the CS and LUCIFER, discussed, among other things, the amount of money CS owed to LUCIFER, new pill designs, and the purchase of more MDMA and 20 grams of allegedly high quality cocaine by the CS from LUCIFER.   LUCIFER also sent the CS a photograph of the cocaine using FACEBOOK messenger.   Based on SA Bonescz's training and experience, SA Bonescz believes the photo depicts high quality cocaine.

25.   On June 29, 2015, SA Bonesz and SA Sugiyama watched the CS log into PayPal using CS' PayPal account.   The CS then gave SA Bonesz and SA Sugiyama access to this PayPal account by CS.   In the presence of SA Bonesz and SA Sugiyama, CS sent a partial payment to LUCIFER using the alias "freek wisseborn" to the email address of Bugatti.k@outlook.com in the amount of 3,200.00 EUR ($3,691.72 USD).   On July 11, 2015, an HSI undercover agent, acting on the CS' behalf, sent the remaining balance of approximately 3,950 EUR to LUCIFER.

26.   On May 17, 2016, the CS contacted LUCIFER on the SUBJECT ACCOUNT to order 1,000 MDMA pills for 1,750 Euros[3].

27.   On May 24, 2016, the CS contacted LUCIFER on the SUBJECT ACCOUNT to confirm the bank account information for the $2,000 wire transfers for the 1,000 MDMA pills.

28.   On May 27, 2016, CS informed LUCIFER by FACEBOOK that the money was sent and forwarded a copy of the wire transfer receipt.

---

[3] This amount in Euros is approximately $2,000 USD.

29.   On June 2, 2016, CS inquired on FACEBOOK about the status of the package. LUCIFER responded that it was ready and that he was going to send "when the store is open."

30.   The package did not arrive.  It is suspected that it may have been seized in transport by Dutch authorities.

**C.   Preservation of FACEBOOK Data**

31.   On approximately June 8, 2016, I sent FACEBOOK a preservation letter requesting that information associated with the SUBJECT ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).  Or approximately September 6, 2016, I sent FACEBOOK a preservation letter requesting that information associated with the SUBJECT ACCOUNT be preserved for an additional 90 days pursuant to 18 U.S.C. § 2703(f).

32.   HSI's preservation request to FACEBOOK expires today, January 23, 2017.

33.   The Dutch investigation into LUCIFER remains on-going. The Dutch require that information relating to LUCIFER's transactions through FACEBOOK be obtained through a search warrant.

34.   Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNT by other means.

### IV.   BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

35.   In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.  Providers, like FACEBOOK,

allow subscribers to obtain accounts like the SUBJECT ACCOUNT/S.
Subscribers obtain an account by registering with the provider.
During the registration process, providers generally ask their
subscribers to provide certain personal identifying information
when registering for an e-mail or social media account.  Such
information can include the subscriber's full name, physical
address, telephone numbers and other identifiers, alternative e-
mail addresses, and, for paying subscribers, means and source of
payment (including any credit or bank account number).  Some
providers also maintain a record of changes that are made to the
information provided in subscriber records, such as to any other
e-mail addresses or phone numbers supplied in subscriber
records.  In my training and experience, such information may
constitute evidence of the crimes under investigation because
the information can be used to identify the user(s) of a SUBJECT
ACCOUNT.

36.   Therefore, the computers of FACEBOOK are likely to
contain stored electronic communications and information
concerning subscribers and their use of FACEBOOK's services,
such as account access information, e-mail or message
transaction information, and account application information.
In my training and experience, such information may constitute
evidence of the crimes under investigation because the
information can be used to identify the user(s) of a SUBJECT
ACCOUNT.

37.   The subscriber will also generally need to use a
password that will allow the user to gain access to the account.

Many providers do not store the password directly, rather they use an algorithm (often referred to as a "hashing" algorithm) that is performed on the password and generates a new random of string of numbers and characters, which is what the provider may store.  When a user enters his or her password, the hashing algorithm is performed on the password before it is presented to the provider, and the provider will verify the hash value for the password (rather than the password itself) to authorize access to the account.  As an added security feature, some providers insert additional text before or after the password, which additional text is referred to as "salting" the password. The hashing algorithm is then performed on the combined password and salt, which is the hash value that will be recognized by the provider.  Alternatively or in addition to passwords, users may be required to select or propose a security question, and then provide an answer, which can be used to substitute for a password or to retrieve or reset a user's password.

     38.  A subscriber of FACEBOOK can also store with FACEBOOK files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or photos or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by FACEBOOK.  In my training and experience, evidence of who was using an account may be found in such information.

     39.  In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems.

This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

40. In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

41. I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time. Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account. Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring FACEBOOK to turn over all information

associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

42. Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT. If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

43. In my training and experience, providers also keep a record of search queries run by the user of the account, whether searches within the services of the provider for persons, content, or other accounts (such as if a user is trying to find the account of an acquaintance), or broader Internet searches. In some instances, providers may also keep records of which websites or contents were "clicked on" as a result of these searches. This information is helpful in the context of the case to show the topics about which the user was trying to obtain more information or conduct research, and is relevant for "user attribution" evidence, analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

44. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes. They can also discuss

aspects of the crime without specifically mentioning the crime
involved.  In the electronic world, it is even possible to use
pictures, images and emoticons (images used to express a concept
or idea such as a happy face inserted into the content of a
message or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon
and parenthesis :) to convey a smile or agreement) to discuss
matters.  "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures
set forth in Attachment B, is necessary to find all relevant
evidence within the account.

45.  This application seeks a warrant to search all
responsive records and information under the control of the
FACEBOOK, which is subject to the jurisdiction of this court,
regardless of where FACEBOOK has chosen to store such
information.

46.  As set forth in Attachment B, I am requesting a
warrant that permits the search team to keep the original
production from FACEBOOK under seal until the investigation is
completed and, if a case is brought, that case is completed
through disposition, trial, appeal, or collateral proceeding.

a.  I make that request because I believe it might be
impossible for FACEBOOK to authenticate information taken from a
SUBJECT ACCOUNT as its business record without the original
production to examine.  Even if FACEBOOK kept an original copy

16

at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel FACEBOOK to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for FACEBOOK to examine a particular document found by the search team and confirm that it was a business record of FACEBOOK's taken from a SUBJECT ACCOUNT.

47.  I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

48.  I know based on my training and experience that providers of e-mail or social media services generally have access to and store the web or Internet browsing history of the user while he or she is logged into an account.  That history can include the names and specific websites or URLs/URIs (Uniform Resource Locators or Indicators) of the sites that have been visited.

49.   Providers of similar services will often keep track of what is referred to as user agent string, which contains information about the type of computer, operating system, and web browser used to access the service.   User agent string can include:  web requests or HTTP requests (hypertext transfer protocol is the protocol by which many web pages are transmitted between servers and clients or users); logs containing information such as the requestor's IP address, identity and user ID, date and timestamp, request URL or URI (Uniform Resource Locator or Indicator, i.e., a website address), HTTP protocol version, referrer, and similar information; login tracker logs; account management logs; and any other e-mail or social media accounts accessed by or analytics related to the SUBJECT ACCOUNT.   These can be used to determine the types of devices used while accessing the SUBJECT ACCOUNT, as well as data related to the user's activity while accessing the SUBJECT ACCOUNT.

50.   I have also learned that providers of e-mail and social media services often track the behavior and activities of persons using accounts by using cookies, which are strings of characters and numbers stored on a person's computer on their web browser.   These cookies can often show whether more than one account was accessed by the same computer (and specifically the same web browser), as the provider can recognize that cookie when the same device returns to the service to access an account.

51.   In order to identify other accounts used or maintained by the user of a SUBJECT ACCOUNT, the warrant also calls for FACEBOOK to disclose both (1) any cookies associated with a SUBJECT ACCOUNT, i.e., those cookies that were placed on any computers or web browsers (for example, Internet Explorer or Google Chrome) used to access the SUBJECT ACCOUNT, and (2) the identity of any other account in which the same cookie or cookies used to access the SUBJECT ACCOUNT was recognized.   If in the course of the investigation the digital devices used by the subject(s) of the investigation are found, they can be searched to determine if the cookies recognized by the provider are stored on those devices.   The warrant also calls for FACEBOOK to identify any other accounts accessed by any computer or web browser using the same cookies as the SUBJECT ACCOUNT by providing subscriber records and log-in information for those other accounts (but not to provide the contents of communications in those other accounts).

52.   Users of accounts are often required to include an e-mail account as well as a phone number in subscriber records. The e-mail account may be an e-mail account hosted at the same provider, or an account at a different provider.   The e-mail account is referred to by a number of names, such as a secondary e-mail account, a recovery e-mail account, or an alternative e-mail account or communication channel.   That e-mail account is often used when the identity of the user of the primary account (here, a SUBJECT ACCOUNT) needs to be verified, for example if a password is forgotten, so that FACEBOOK can confirm that the

19

person trying to access the account is the authorized user of the account. Similarly, the telephone number used in subscriber records is often used to send a passcode via text (or "SMS") that must be presented when trying to gain access to an account, either in a similar scenario where a user forgot his or her password, or when users implement what is referred to as "two-factor authentication" (where the password is one factor, and the passcode sent via text message to a mobile device is a second). In either scenario, the user of a primary e-mail account (a SUBJECT ACCOUNT) and a secondary e-mail account or phone number listed in subscriber records are very often the same person, or at least are close and trusted and/or working in concert. That is because access to either the secondary e-mail account or to the phone number listed in subscriber records can allow access to the primary account.

53. Providers also frequently obtain information about the types of devices that are used to access accounts like the SUBJECT ACCOUNT. Those devices can be laptop or desktop computers, cellular phones, tablet computers, or other devices. Individual computers or devices are identified by a number of different means, some of which are assigned to a particular device by a manufacturer and connected to the "hardware" or the physical device, some are assigned by a cellular telephone carrier to a particular account using cellular data or voice services, and some are actually assigned by FACEBOOK to keep track of the devices using its services. Those device identifiers include an Android ID, Advertising ID, unique

application number, hardware model, operating system version, unique device identifiers, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, Media Access Control ("MAC") addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"). Apple, one of the primary suppliers of mobile devices used to access accounts like the SUBJECT ACCOUNT, had previously used an identifier that was unique to the hardware of its devices, such that details of a device's activity obtained from a particular application or "app" could be used to target advertisements for the user of that device.   Apple replaced that hardware-based identifier with the Apple advertiser ID or IDFA that is still unique to a particular device, but which can be wiped and re-generated anew by a user if a user chooses to do so.   Most users, however, do not know that the IDFA exists, and therefore are unaware that their device's activity can be correlated across different apps or services.

54.   These device identifiers can then be used (a) to determine accounts accessed at other providers by that same device, and (b) to determine whether any physical devices found in the course of the investigation were the ones used to access each SUBJECT ACCOUNT.   The requested warrant therefore asks for

the device identifiers, as well as the identity of any other account accessed by a device with the same identifier.

55.   Providers of e-mail and social media often maintain have access to and store information related to the location of the users of accounts they service.   That information may be obtained by the provider in a number of ways.   For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System (GPS) information.   It may also be accessible through "check-in" features that some providers offer that allow users to transmit or display their location to their "friends" or "acquaintances" via the provider.

56.   Based on a review of information provided by FACEBOOK regarding its services, information provided by other FBI Special Agents, and/or my training and experience, I am aware of the information contained in this section of the affidavit regarding FACEBOOK.

57.   FACEBOOK owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.   FACEBOOK allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other FACEBOOK users, and sometimes with the general public.

58.   FACEBOOK asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.   This subscriber information may include the user's full name, birth date, gender, contact e-mail addresses, FACEBOOK passwords, FACEBOOK security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.   FACEBOOK also assigns a user identification number to each account.

59.   FACEBOOK users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.   FACEBOOK assigns a group identification number to each group.   A FACEBOOK user can also connect directly with individual FACEBOOK users by sending each user a "Friend Request."   If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of FACEBOOK and can exchange communications or view information about each other.   Each FACEBOOK user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

60.   FACEBOOK users can select different levels of privacy for the communications and information associated with their FACEBOOK accounts.   By adjusting these privacy settings, a FACEBOOK user can make information available only to himself or herself, to particular FACEBOOK users, or to anyone with access to the Internet, including people who are not FACEBOOK users.   A

FACEBOOK user can also create "lists" of FACEBOOK friends to
facilitate the application of these privacy settings.  FACEBOOK
accounts also include other account settings that users can
adjust to control, for example, the types of notifications they
receive from FACEBOOK.

61.  FACEBOOK users can create profiles that include
photographs, lists of personal interests, and other information.
FACEBOOK users can also post "status" updates about their
whereabouts and actions, as well as links to videos,
photographs, articles, and other items available elsewhere on
the Internet.  FACEBOOK users can also post information about
upcoming "events," such as social occasions, by listing the
event's time, location, host, and guest list.  In addition,
FACEBOOK users can "check in" to particular locations or add
their geographic locations to their FACEBOOK posts, thereby
revealing their geographic locations at particular dates and
times.  A particular user's profile page also includes a "Wall,"
which is a space where the user and his or her "Friends" can
post messages, attachments, and links that will typically be
visible to anyone who can view the user's profile.

62.  FACEBOOK allows users to upload photos and videos,
which may include any metadata such as the user's location when
s/he captured or uploaded the photo or video.  It also provides
users the ability to "tag" (i.e., label) other FACEBOOK users in
a photo or video.  When a user is tagged in a photo or video, he
or she receives a notification of the tag and a link to see the
photo or video.  For FACEBOOK's purposes, the photos and videos

associated with a user's account will include all photos and
videos uploaded by that user that have not been deleted, as well
as all photos and videos uploaded by any user that have that
user tagged in them.

63. FACEBOOK users can exchange private messages on
FACEBOOK with other users.  These messages, which are similar to
e-mail messages, are sent to the recipient's "Inbox" on
FACEBOOK, which also stores copies of messages sent by the
recipient, as well as other information.  FACEBOOK users can
also post comments on the FACEBOOK profiles of other users or on
their own profiles; such comments are typically associated with
a specific posting or item on the profile.  In addition,
FACEBOOK has a feature that allows users to send and receive
instant messages through FACEBOOK.  These communications are
stored in the history of communications for the account.
FACEBOOK also has a Video Calling feature, and although FACEBOOK
does not record the calls themselves, it does keep records of
the date of each call.  FACEBOOK users can also send files in
various other formats as attachments to private messages.  For
example, a user can send another FACEBOOK account a compressed
archive file in the format .zip as an attachment to a message.

64. If a FACEBOOK user does not want to interact with
another user on FACEBOOK, the first user can "block" the second
user from seeing his or her account.

65. FACEBOOK has a "like" feature that allows users to
give positive feedback or connect to particular pages.  FACEBOOK
users can "like" FACEBOOK posts or updates, as well as webpages

or content on third-party (i.e., non-FACEBOOK) websites. FACEBOOK users can also become "fans" of particular FACEBOOK pages.

66.  FACEBOOK has a search function that enables its users to search FACEBOOK for keywords, usernames, or pages, among other things.

67.  Each FACEBOOK account has an activity log, which is a list of the user's posts and other FACEBOOK activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a FACEBOOK page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's FACEBOOK page.

68.  FACEBOOK Notes is a blogging feature available to FACEBOOK users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

69.  The FACEBOOK Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  FACEBOOK users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

70.   FACEBOOK also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

71.   In addition to the applications described above, FACEBOOK also provides its users with access to thousands of other applications ("apps") on the FACEBOOK platform.  When a FACEBOOK user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

72.   Some FACEBOOK pages are affiliated with groups of users, rather than one individual user.  Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter.  FACEBOOK can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.  FACEBOOK uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

73.   FACEBOOK uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' FACEBOOK user identification numbers; groups and networks of which the user is a member, including the groups'

27

FACEBOOK group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of FACEBOOK applications.

74.    FACEBOOK also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on FACEBOOK, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a FACEBOOK profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

75.    Social networking providers like FACEBOOK typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, FACEBOOK users may communicate directly with FACEBOOK about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like FACEBOOK typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

76. As explained herein, information stored in connection with a FACEBOOK account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a FACEBOOK user's "Neoprint," IP log, stored electronic communications, and other data retained by FACEBOOK, can indicate who has used or controlled the FACEBOOK account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the FACEBOOK account at a relevant time.

77. Further, FACEBOOK account activity can show how and when the account was accessed or used. For example, as described herein, FACEBOOK logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of FACEBOOK access, use, and events relating to the crime under investigation. Additionally, FACEBOOK builds geo-

location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and FACEBOOK "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the FACEBOOK account owner.

78.  Last, FACEBOOK account activity may provide relevant insight into the FACEBOOK account owner's state of mind as it relates to the offense under investigation.  For example, information on the FACEBOOK account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

79.  Therefore, the computers of FACEBOOK are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of FACEBOOK, such as account access information, transaction information, and other account information.

80.  Internet.  The Internet is a collection of computers and computer networks which are connected to one another via high-speed data links and telephone lines for the purpose of communicating and sharing data and information.  Connections between Internet computers exist across state and international borders; therefore, information sent between two computers connected to the Internet frequently crosses state and international borders even when the two computers are located within the same state.

81.  <u>Internet Service Providers</u>.   Individuals and
businesses obtain access to the Internet through businesses
known as Internet Service Providers ("ISPs").   ISPs provide
their customers with access to the Internet using telephone or
other telecommunication lines; provide Internet e-mail accounts
that allow users to communicate with other Internet users by
sending and receiving electronic messages through the ISPs'
servers; remotely store electronic files on their customers'
behalf; and may provide other services unique to each particular
ISP.   ISPs maintain records pertaining to individuals or
businesses that have subscriber accounts with them.   Those
records often include identifying and billing information,
account access information in the form of log files, e-mail
transaction information, posting information, account
application information, and other information both in computer
data and written record format.

82.  <u>IP Addresses</u>.   An Internet Protocol ("IP") address is
a unique numeric address used by each computer on the Internet.
An IP address is a series of four numbers, each in the range 0-
255, separated by periods (e.g., 121.56.97.178).   Every computer
attached to the Internet must be assigned an IP address so
Internet traffic sent from and directed to that computer may be
properly directed from its source to its destination.   Most ISPs
control a range of IP addresses.   When a customer logs into the
Internet using the service of an ISP, the computer used by the
customer is assigned an IP address by the ISP.   The customer's
computer retains that IP address for the duration of that

session (i.e., until the user disconnects), and the IP address
cannot be assigned to another user during that period.

83. <u>Narcotics trafficking and use of computers</u>. Based
upon my training, knowledge, and experience in narcotics
trafficking investigations, and the training and experience of
other law enforcement officers with whom I have had discussions,
there are certain characteristics common to individuals involved
in the trafficking of narcotics using computers.

84. Since the advent of the computer and further
enhancements to electronic communication, I have seen and
investigated narcotics traffickers who use this technology to
further their crimes. Wiretaps for instance have been used for
over forty years and still are used for voice and simple data
(text message) text message intercepts. With new technology, I
know that traffickers often use various forms of electronic
communication because the traffickers are aware of the levels
and steps it takes law enforcement to intercept electronic data.
Furthermore, traffickers are becoming more aware at the speed at
which law enforcement can effectively pursue and implement court
authorized intercepts.

85. Because of this knowledge of traffickers, I know that
traffickers will use a variety of applications to communicate.
Some of these applications are immediately and automatically
deleted (based on provider parameters or user settings) while
other applications will store data for various amounts of time.

## V.   REQUEST FOR NON-DISCLOSURE

86.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding FACEBOOK not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant because there is reason to believe that such notification will result in (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) otherwise seriously jeopardizing the investigation; or (4) unduly delaying trial.  The current investigation set forth above is not public, and I know, based on my training and experience, that those who traffic in controlled substances often will destroy digital evidence if they learn of an investigation.  In addition, if FACEBOOK or other person notifies the target of the investigation that a warrant has been issued for a SUBJECT ACCOUNT, the unidentified trafficker might further mask his activity and seriously jeopardize the investigation.

///

///

///

///

///

///

///

///

///

///

## VI.   CONCLUSION

87.   Based on the foregoing, I request that the Court issue the requested search warrant.

_____
Justin Wiessner, Special Agent
Department of Homeland Security,
Homeland Security Investigations

Subscribed to and sworn before
me this **23** day of January,
2017.

_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE

34